**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| JEFFREY E. GODWIN and OAKYWOOD FARMS, LLC, | |
| Plaintiffs, | |
| v. | Case No.: 2:19-cv-0766-LA |
| CNH INDUSTRIAL AMERICA, LLC | Hon. Lynn Adelman |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Jeffery E. Godwin and Oakywood Farms, LLC, (collectively, "Plaintiffs") file this First Amended Complaint against CNH Industrial America, LLC ("CNH Industrial"). In support thereof, Plaintiffs state the following:

## INTRODUCTION

1.    CNH Industrial is the American subsidiary of a global Dutch conglomerate that manufacturers agricultural equipment. For years, CNH Industrial has been inducing farmers in the United States, including Plaintiffs, to purchase fundamentally flawed Module Express cotton pickers through a coordinated scheme of deceptive, unfair, and unlawful conduct.

2.    The Module Express was purported to represent a revolution in cotton harvesting: a single piece of equipment that could both pick cotton and pack it into modules. But CNH Industrial rushed its picker to market, intent on beating John Deere (which was also designing a picker-baler) and increasing its share of the American cotton market. CNH Industrial knew that its Module Express pickers suffered from fundamental design defects—including problems with the power, hydraulic, module packing, and software systems—and continual, crippling manufacturing process failures, and that this incredibly expensive piece of farm equipment would

never function correctly.

3.    Despite this knowledge, CNH Industrial carried out a methodical scheme to falsely represent specific characteristics of the Module Express with the intent and effect of inducing unsuspecting farmers into buying them.  After farmers purchase a Module Express picker (and invariably face repeated mechanical failures) CNH Industrial deliberately misrepresents the nature of the problem as fixable and isolated, causing farmers to keep their pickers, trade in for "new model" pickers, and not realize their legal claims.

4.    CNH Industrial buys back previously-sold Module Express pickers that have proven to be effectively useless from farmers at hugely deflated values.  It then takes these pickers—which it knows cannot successfully operate to pick and bale cotton—and re-sells them to other farmers. All the while, CNH Industrial makes the same misrepresentations regarding the features and functionality of these used pickers that it does for new pickers.

5.    Once farmers own these defective Module Express Pickers, they invariably break down and fail to operate as represented or reasonably expected.

6.    Through its deliberate, pernicious conduct CNH Industrial has caused millions of dollars of harm to cotton farmers who often cannot absorb such losses without catastrophic effects to their livelihoods.

7.    Plaintiffs are among the many farmers and farm businesses who have been harmed through CNH Industrial's conduct, and have incurred individual damages, including consequential damages (such as lost revenue and profits; increased repair, labor, replacement part and fuel expenses; lost opportunity; and lost harvests).

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

Plaintiffs are citizens of Georgia. CNH Industrial is a Delaware company with its principal place of business in Wisconsin. Its sole member is Case New Holland Industrial, Inc., a Delaware corporation with its principal place of business in Wisconsin. Thus, CNH Industrial is a citizen of Delaware and Wisconsin. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs seek more than $75,000, and have a good faith basis to believe that more than $75,000 is at issue in this case. Plaintiffs seek attorneys' fees, direct and indirect pecuniary and monetary damages, and a refund of purchase prices. Module Express pickers sell for as much as $500,000 each. In addition to damages recoverable in any class action currently on file related to the Module Express pickers, Plaintiffs seek more than $75,000 in this action.

9.      Venue in this case is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1441 in the United States Court for the Eastern District of Wisconsin in that a substantial portion of Defendant's conduct which forms the basis of this action occurred in this judicial district. Defendant has its corporate headquarters in this district and the deceptive conduct at issue emanated from this judicial district. Defendant received, and continues to receive, substantial revenue from its unlawful conduct in this judicial district. Defendant is subject to personal jurisdiction in this judicial district at the time this action was commenced and is deemed to reside in this judicial district.

## PARTIES

10.     Plaintiff Oakywood Farms, LLC is a limited liability company that was formed and operates in Georgia.

11.     Plaintiff Jeffery E. Godwin is a resident of Georgia and the owning member/manager of Oakywood Farms, LLC. Mr. Godwin runs a farm based in Cairo, Georgia and owned a 2011 Module Express picker. Plaintiffs are involved in the production of cotton and other

crops and livestock.

12. Defendant CNH Industrial America LLC is a Delaware entity with its principal place of business in Racine, Wisconsin. It is a wholly owned subsidiary of CNH Industrial NV, a Dutch-based capital goods company with annual revenues greater than $25,000,000,000. CNH Industrial designs, markets, manufactures and sells the Case Module Express cotton pickers at issue in this case. CNH Industrial NV has a number of other American subsidiaries, including CNH Industrial Capital. These subsidiaries are created solely as a shield from potential liability. The American subsidiaries of CNH Industrial NV, including CNH Industrial America, LLC and CNH Industrial Capital, operate in concert and essentially as one entity, sharing ownership and leadership. CNH Industrial America, LLC and CNH Industrial Capital are alter egos of each other, although the structure and overlapping management of each is hidden from customers and the public.

13. CNH Industrial's corporate offices in Racine, Wisconsin operate as the "nerve center" of its business activities and the full extent of its operations are controlled from this location, including all major marketing, design, and manufacturing decisions relevant to the allegations in this Complaint. The misrepresentations alleged herein were "made" in Wisconsin in that CNH Industrial caused them to exist from its corporate headquarters in Racine, Wisconsin. As set out below, CNH Industrial has engaged in a company-wide scheme to cause cotton farmers to buy faulty and ineffective pickers through false and misleading statements, and this scheme arose in and was controlled from the CNH Industrial's headquarters in Racine, Wisconsin even if the statements appeared or were seen elsewhere. Under precedential law, Wisconsin common law and the Wisconsin Deceptive Trade Practices Act, Wisconsin Statutes § 100.18 *et seq.*, apply to the claims of Plaintiffs.

14.     CNH Industrial sells and services new and used Module Express pickers through a complicated transactional structure involving itself, its sister entity CNH Industrial Capital, and its network of heavily-controlled dealers. CNH Industrial used these dealers to disseminate and reiterate its uniform false statements to farmers, to set the prices for new and used Module Express pickers, and to—itself—play an indispensable role as a party in the sale of new and used pickers to farmers. CNH Industrial closely monitored and controlled its dealers partly through a centralized computer system called the Case Communication Network.

## FACTUAL ALLEGATIONS

### The Cotton Industry and Development of the Module Express

15.     This litigation involves cotton pickers that CNH Industrial designed, manufactured, marketed, and sold as the Case Module Express (the "Module Express" pickers).

16.     Since the 1940's, cotton has been harvested using three pieces of machinery: a mechanical picker (which collects the cotton off the plants), a boll buggy (which transfers the cotton from the picker to the module builder), and a module builder (which compacts the cotton into large rectangular shapes that maintain structure and can be transferred to a gin for processing). The importance of reliable, effective harvesting equipment in the cotton farming industry cannot be overstated. Cotton can only be harvested during certain weather conditions and during a certain temporal window, usually less than a month long. If cotton is not harvested during these narrow time frames, farmers often incur immense losses. Because of this narrow window, cotton harvesting equipment must not only be reliable, the machine must be repairable. In the event of a breakdown—for whatever reason—time is of the essence and efficiency and reliability are paramount.

17.     In the late 1990's, the world's two largest manufacturers of agricultural equipment–

CNH Industrial (frequently and colloquially known as "Case IH") and John Deere–separately began development of pickers that purportedly would allow cotton farmers to harvest cotton using a single piece of machinery. This "on-board module-building" type picker would, theoretically, both pick cotton and compact it into a module without the need for a buggy and stand-alone module builder. The cotton industry considered this to be a potentially revolutionary change; it would represent a leap in efficiency and cost-savings for famers who were increasingly seeing profit shrink in the face of foreign competition.

18. CNH Industrial is a wholly owned subsidiary of CNH Industrial NV, a giant Dutch-based capital goods company that has annual revenues greater than $25,000,000,000. CNH Industrial had long made cotton pickers and was locked in a battle with John Deere, the largest manufacturer of agricultural equipment, for a greater share of that market, particularly in the United States. Deere had begun development of its picker-baler years before CNH Industrial, filing for a patent in 1999, two years before CNH Industrial sought a patent for its on-board module-building picker.[1] But the potential gains for beating CNH Industrial if it beat Deere to market with the new type picker were enormous.

19. Upon information and belief, CNH Industrial knew that there were deep-set, inherent problems in its new picker's design and manufacture such that the Module Express picker would never operate correctly, and that to resolve these problems would require fundamental changes and significant delay. Delay of that magnitude would result in that Deere dominating the market before CNH Industrial could sell the new type of picker. And so, upon information and belief, CNH Industrial made a financial decision to push its picker to market first, although the

---

[1] Notably, CNH Industrial appears to have since let its 2001 patent for the Module Express packing system lapse, and has rather filed patents for alternative packing systems; essentially recognizing that the system it sold to farmers as workable is untenable.

picker it would market and sell was irreparably flawed.

20.    In October 2006, CNH Industrial introduced its new picker, the Case Module Express 625.  The Module Express, as represented, was designed to pick cotton at more than three miles per hour whether on wet or dry ground, while at the same time forming the picked cotton into a well-formed rectangular module that could be deposited in the field.  This was represented to be accomplished by one person operating the Module Express. The rectangular module it was to create was 8 feet by 8 feet by 16 feet, half the size of a traditional cotton module, and up to 10,000 pounds in weight.  Purportedly, a new auger system and software in the module building section of Module Express would consistently pack the cotton such that it would create a domed top and hold together when deposited in the field, allowing the module to be manually covered with a tarp and later transferred to the gin.  This would allow cotton famers to trade in their current picker, buggy, and module builder for a single piece of equipment which would accomplish all three tasks more quickly, more efficiently, and with less labor and operating costs than previously. This was immensely attractive to farmers at this time as economic conditions for farmers, and cotton farmers in particular, had been worsening for some time.

21.    CNH Industrial priced the Module Express at nearly $500,000.  This is far more than a traditional picker, and CNH Industrial priced it with the intent of capturing much of the purported cost savings CNH Industrial promised farmers they would see through the "revolutionary" Module Express.  In approximately 2012, CNH Industrial changed the model number of the Module Express to 635.  Upon information and belief, CNH Industrial implemented the model number change, not as a legitimate delineation between substantively different pickers, but as part of CNH Industrial's larger scheme to control fallout from the faulty 625 designation through rebranding, much like when Ford sold rebranded Pintos as Bobcats. CNH Industrial all

7

the while continued to make the same representations about the ability of the Module Express to be operated by one person, to create consistent modules, and to operate on wet and dry ground equally effectively.

22.     As discussed below, CNH Industrial carried out a consistent scheme to deceptively market and sell the Module Express.  CNH Industrial made specific, factual representations that were wholly untrue with the intent and effect of inducing farmers to purchase Module Express pickers. This scheme had the effect of inducing Plaintiffs to purchase a Module Express picker.

23.     The Module Express was and is hugely flawed; a result of deep-set manufacturing failures and defective design, that CNH Industrial rushed to market and sold to unsuspecting farmers knowing that it would never operate as promised.  CNH Industrial sold these pickers based upon misrepresentations, then falsely assured farmers that "patches" and fixes were coming that would fix the unfixable machine. When farmers would trade in their Module Express pickers (often as the result of false statements that the "new" pickers would live up to the representations CNH Industrial continued making), CNH Industrial would take those inoperable machines, and resell them to other unsuspecting farmers at huge markups based upon the same falsities it used in selling the other machines.

24.     CNH Industrial's intentional, long-running scheme caused many thousands of dollars in damage to Plaintiffs.

## CNH Industrial's Misrepresentations to Plaintiffs

25.     CNH Industrial has consistently made statements regarding the Module Express pickers which are untrue, deceptive and misleading, with the intent and effect of inducing farmers, including Plaintiff, to buy an incredibly expensive—and important—piece of equipment that would never operate as promised or reasonably expected and which would be worth far less than

it should be after purchase.

26.     CNH Industrial engaged in its marketing scheme through a coordinated, centralized effort emanating from its Racine, Wisconsin headquarters. CNH Industrial executives located there determined how to market and represent the Module Express, and disseminated those materials to the public, through in person communication, through press filings, through uniform marketing documents included in publications and distributed to dealers, and through promotional videos available to the public. All representations alleged herein were "made" in Wisconsin in that they were caused to exist and emanated from CNH Industrial's headquarters in Racine, Wisconsin.

27.     Although CNH Industrial used multiple avenues to disseminate false, misleading, and deceptive representations, the singular narrative thread, and indeed many of the chosen words, among all representations was that the Module Express was a reliable machine that was powerful and could operate in all conditions (wet and dry), that with the Module Express one person could perform all harvesting and module building tasks, and that the Module Express would both pick cotton and build consistent, well-formed, domed cotton modules. None of this was true.

28.     Plaintiffs were exposed to CNH Industrial's misrepresentations through multiple channels and relied upon them in purchasing the Module Express picker. First, before purchasing the Module Express picker, Oakwood Farms, LLC's owner Mr. Godwin, viewed advertisements for the Module Express pickers in agricultural publications he regularly read such as Southeast Farm Press, Progressive Farmer Magazine, and/or Cotton Farmer magazine. The representations received regarding the Module Express pickers fell in line with CNH Industrial's uniform marketing statements. This included representations that the Module Express would create

9

consistent, domed modules.[2] This also included representations that the Module Express pickers allowed for a one man picking and baling operation (as CNH Industrial liked to phrase it: "one man, one machine").[3] This also included representations that the Module Express machines would operate just as effectively on wet or dry ground.[4]

29.     Second, before purchasing the Module Express picker, Oakywood Farms, LLC owner Mr. Godwin spoke with a sales representative named Graham Ginn. Mr. Ginn affirmed these representations that Mr. Godwin had become aware of. Mr. Ginn parroted CNH Industrial's marketing representations. Namely that the Module Express would allow for a one man picking and baling operation; would create serviceable, consistent, domed modules; and that it would operate as well on wet ground as dry ground. Mr. Ginn also reiterated the representations CNH Industrial provided that the Module Express 635 in particular had a design that would allow it to more effectively accomplish all of these tasks. [5]

30.     Notably, CNH Industrial's representations were specific and meaningful, designed

---

[2] 2009 CNH Industrial website, available at https://web.archive.org/web/20081115050612/http://www.caseih.com/products/series.aspx?seriesid=2880&navid=105&RL=ENNA; 2015 CNH Industrial website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers; 2017 and 2018 CNH Industrial website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers; *See* June 21, 2007 CNH Industrial public press release, available at https://www.farmprogress.com/cases-new-board-module-builder-technology.

[3] FarmProgress "Case introduces first module-building cotton picker," Oct. 19, 2006, available at https://www.farmprogress.com/case-introduces-first-module-building-cotton-picker; CNH Industrial, "Module Express ™ 625," available at https://www.toytractortimes.com/files/CIH9250604.pdf.; "Case IH Module Express – 1 Man. 1 Machine." Dec. 19, 2007. Available at https://www.youtube.com/watch?v=ZRhsAsHT68w.

[4] *See* July 11, 2007 CNH Industrial public press release, available at http://www.marketwired.com/press-release/cutting-edge-cotton-harvester-rolls-off-the-line-nyse-cnh-750508.htm.

[5] *See, e.g.,* "CASE IH MODULE EXPRESS 635" available at https://assets.cnhindustrial.com/caseih/NAFTA/NAFTAASSETS/Products/Harvesting/Module-Express-Cotton-Pickers/Brochures/Cotton_Module_635_Handout_CIH10141101_1-11.pdf

to induce farmers to purchase the faulty Module Express pickers. These were not representations of opinion on a matter of judgment or puffery—*e.g.* that the Module Express picker was the "smarter choice" or the "best"—but rather representations of fact that may be objectively proven as false and which Plaintiffs will prove as false. These representations have specific meanings within the cotton industry. They were not limited to one model or model year of Module Express pickers and CNH Industrial continuously made these representations. Industry usage and context confirms that CNH Industrial's representations to the in selling the Module Express are measurable, quantifiable metrics which can be proven false.

31. These specific representations made by CNH Industrial from its Wisconsin headquarters to the public, including Plaintiffs, were false, deceptive, and misleading. The Module Express picker that Plaintiffs purchased failed to operate as CNH Industrial promised. It failed and broke down in the field quickly and often, needed continual repairs, and was not reliable enough such that Plaintiff could use it throughout a cotton harvest. The Module Express did not have sufficient power to pick cotton in diverse terrain or weather; it broke down, bogged down, and elements related to the hydraulic system failed or got stuck. The module packing system failed to create consistent, domed, rectangular modules that will hold together and be weatherable. CNH Industrial's representations were untrue, deceptive, and, upon information and belief, CNH Industrial knew it to be so, but acted intentionally and aggressively to continue to sell the high-priced Module Express pickers to unsuspecting farmers and to falsely claim that previous problems had been remedied

32. Each of these representations materially induced Plaintiffs to purchase the Module Express 635 picker. Plaintiffs relied upon them and would not have purchased their Module Express picker, or paid what it did for it, if it had known these representations were untrue.

**The Module Express Pickers Have Significant Design And Manufacturing Defects**

33.     The Module Express pickers have significant design and manufacturing failures. CNH Industrial, upon information and belief following investigation, pushed the Module Express to market knowing that it had significant design flaws, particularly in the hydraulic, power, and module forming components.  Such flaws manifest themselves often, and specifically in the case of Plaintiffs, in a lack of sufficient power to operate in diverse terrain and weather conditions, failure to create consistent, well-formed modules, and lead to the necessity of more than one operator for picking and baling operations, as well as consistent eventual failures and break-downs in the Module Express pickers. CNH Industrial attempted to purportedly remedy some of these issues through multiple software patches, but was unable to do so.

34.     These failures and design shortcomings, all of which CNH Industrial was aware before it ever marketed the Module Express, rendered false its representations regarding the "one man, one machine" operational capabilities, the ability of Module Express pickers to create consistent well-packed modules, and the Module Expresses ability to operate in wet conditions.

35.     Further, CNH Industrial experienced continual and widespread manufacturing failures at the plant in which the Module Express pickers are made.  All Module Express pickers in the United States were manufactured at a plant CNH Industrial owns and operates in Benson, Wisconsin.  From the beginning of the Module Express production, and consistently to this day, the Benson plant has had widespread problems with the manufacturing, workmanship, and assembly of Module Express pickers that caused the pickers to be faulty and to break down quickly and continually in the field.  Upon information and belief, CNH Industrial was well-aware of the problems with implementing and controlling an effective manufacturing processes for the Module Express and repeatedly changed management at the Benson plant to try to correct them, but was

unable to correct the design and manufacturing flaws with the Module Express pickers.

**Plaintiffs' Module Express Picker and CNH Industrial's Continued Representations**

36.     In late 2012, Oakywood Farms needed an additional cotton picker for an unexpectedly large cotton crop. Oakywood Farms had a traditional John Deere picker, boll buggy and module builder in operation, but needed more picking and module building capacity. Because Oakywood had a shortage of available farm laborers, it was particularly interested in a picking system that would expand its harvesting capabilities without requiring additional labor.

37.     Since Plaintiffs had been exposed to and relied upon CNH Industrial's above-described representations about the Module Express, Mr. Godwin, acting for Oakywood and himself, approached a CNH dealer, AimTrac and a Mr. Graham Ginn. When discussing the Module express, as described above, Mr. Ginn parroted CNH Industrial's representations. Plaintiff relied on the representations CNH Industrial had made in deciding to purchase the Module Express picker.

38.     The Module Express could never create a well-formed module. The Module Express did not allow for one-man operation and Oakywood had to dire extra laborers to pick up loose cotton left in the field by the Module Express. The hydraulic system in the Module Express was defective and underpowered, leading the Module Express to operate poorly on damp ground. The defective Module also experienced breakdowns and malfunctions to the air ducts and tie rods that were the result of defective design and manufacture.

39.     The service technicians at the dealership could not fix the problem. At the behest of CNH Industrial, the dealership continually represented that these problems could be fixed. Plaintiffs reached out to CNH Industrial itself over the phone and CNH suggested fixes that would ameliorate the problem. These representatives suggested that the Module Express could be fixed.

CNH Industrial technicians came from Wisconsin to Oakywood farms in Georgia for a week and attempted to fix the problem. Though they were unable to fix the problem they continued to represent that the Module Express would eventually be fixed and the problem was isolated. Finally, at a meeting, dealership representatives pleaded with Plaintiffs to keep the Module Express representing, at CNH Industrial's urging, that the Module Express could be fixed.

40.     After years of continuous malfunctions and broken promises from CNH and AimTrac, Oakywood Farms returned the picker to AimTrac and considered the matter closed. It was not until later that Godwin learned that CNH maintained that he owed $330,000 for the flawed and failed picker.  It was not until March 2019 that Godwin learned of the substance and extent of CNH's wrongful conduct that gives rise to this lawsuit, including that the entire production run of Module Express 635s suffered from significant problems prior to his purchase, that the 635s as a whole are flawed and poorly manufactured, and that CNH was in the practice of re-selling previously used, flawed 635s to unsuspecting purchasers while representing that they could build serviceable modules, allow a one man picking and baling operation, and operate as well on wet as dry ground.

### How CNH Industrial Sold New And Used Module Express Pickers

41.     CNH Industrial is directly involved in the sale of each Module Express and operates as a party to each sales contract through its financial and agency relationship with dealers and CNH Industrial Capital. The process by which new and used Module Express pickers arrive at an authorized CNH Industrial dealer, and how ownership eventually transfers from CNH Industrial to the farmer is complicated and, at all times, tightly controlled by CNH Industrial.

### New Module Express Picker Sales

42.     CNH Industrial retains an ownership stake and directly participates in the new

pickers that are sold through CNH dealer locations. When a dealer takes delivery of a Module Express, it is deemed to owe CNH Industrial some given amount—through CNH Industrial Capital[6]—that will be paid out of the eventual amount that is paid by a purchaser. However, the amount that the dealer actually "owes" is not finalized upon delivery of the Module Express to the dealer, nor is it generally paid at that time. Rather, it is subject to change based entirely on the actions of CNH Industrial, which may change or set the sales price (or other financial factors) to shift how much of the sales amount goes to the dealer.[7]

43.     When the dealer receives an offer for the purchase of a new Module Express from a farmer, CNH Industrial is informed as to the proposed price and the value of equipment the farmer is trading in through the Case Communication Network. Then, in every sale of a Module Express, CNH Industrial negotiates or offers to the dealer what portion of that purchase price will be retained by the dealer, as opposed to flowing to CNH Industrial for the picker itself.  Then, and only then, can the dealer consummate a sale to the farmer. This serves two purposes.  First, it allows for consummation of the sale. Without CNH Industrial's involvement in the terms of the sale, and negotiation of what dealers will pay for pickers to CNH Industrial at the time of sale, dealers would not complete the sales of new pickers. Second, it is only after at the time of sale to

---

[6] CNH Industrial Capital is the financial services provider for all of CNH's American operations from finance agreements with farmers to inventory finance services between dealers and CNH Industrial. These two entities share ownership, resources, and management. Plaintiffs, upon investigation, believe and allege that they are effectively the same entity, and CNH exercises complete control over the relevant financial aspects, and does so to create a false distinction between the sales and financial roles for the purpose of unlawfully attempting to limit liability. The exact contours of the relationship between CNH Industrial and CNH Industrial Capital are private but discovery will flesh out the full nature of the shared interests and coordination between these entities.

[7] Unlike automobiles, Module Express pickers do not have formal "titles." Ownership in these transactions is connected to financial interest in the value of the machines.

a farmer that the amount the dealer actually "owes" CNH Industrial Capital—in terms of amount of the purchase price—is ultimately determined. The decision of how much the dealer must pay comes through a process known as settlement that involves the dealer, CNH Industrial, and CNH Industrial Capital. During this process, CNH Industrial decides how much the dealer owes for the inventory of which it took delivery. If the piece of equipment was sold to the farmer, the money that CNH Industrial has provided in the sale to the farmer is applied to and lowers the amount owed for the sale. The amount "owed" is then paid to CNH Industrial from the purchase price for each and every Module Express after it is sold.

44. However, in some instances, no amount the dealer owes to CNH Industrial for pickers may truly get "paid" by the dealer. This is because, in a large percentage of transactions with farmers, CNH Industrial Capital is the entity that finances the purchase. In such situations, a farmer pays CNH Industrial Capital (and thus CNH Industrial) and the dealer would owe CNH Industrial nothing for the picker itself, instead retaining a credit (effectively a commission) for selling the picker against its total balance. If the piece of equipment was not sold, CNH Industrial may take other actions to decrease the amount owed by the dealer such as forgiving the interest due.

45. This settlement process is controlled by CNH Industrial and does not take place upon delivery of the Module Express to the dealer. The delivery of the Module Express to a dealer does not divest CNH Industrial in its ownership interest of the Module Express pickers. Indeed, often farmers order pickers from CNH Industrial through the dealers, who simply are intermediaries which retain a portion of the proceeds for their role in the sale. CNH retains a significant financial interest in the Module Express pickers which it recoups only after the time of sale to a farmer. CNH Industrial continues to perform essential ownership functions to finalize the

sale of its Module Express picker to the farmer and to determine how much of the purchase price the dealer would, ultimately, "pay" it—if only on paper—for the Module Express. CNH Industrial's involvement in each Module Express sale is not completed until it determines the terms of the dealer's acceptance of the goods and the sale to the farmer is completed.

46.     Further, this involvement not only makes CNH Industrial a direct party to the sale but, because CNH Industrial's financial interest in the ownership of the Module Express is not extinguished, the dealer acts as CNH Industrial's agent in selling the Module Express pickers. CNH Industrial still has an ownership interest in the Module Express pickers and receives part of the purchase price. CNH Industrial authorizes the dealer to sell the machines it still owns at terms it dictates and then CNH Industrial then gets part of the purchase price.

### Used Module Express Picker Sales

47.     Surprisingly—and solely because of the inherent failures of the product itself—CNH Industrial took a similar role as a party in selling used Module Express pickers through its authorized dealers. This conduct was largely unprecedented at CNH Industrial. Normally, CNH Industrial has no involvement at all with the sale of used equipment. Dealers attempt to acquire used equipment at a favorable price and sell it at a profit. However, when it came to used Module Express pickers, CNH Industrial began participating using the same type of programs and creating the same ownership stakes that it did for new pickers.

48.     Used Module Express Pickers were difficult for dealers to sell on their own as cotton farming communities are generally tight-knit, and other farmers in the area would know that a given picker did not operate as promised. To create this market, CNH Industrial identified for its dealers farmers who owned problematic Module Express pickers. CNH Industrial told its dealers to acquire these used Module Express pickers through a trade-in program under the guise

that new models of the Module Express would live up to CNH Industrial's representations (thus allowing CNH Industrial to sell the "new" version of the Module Express). CNH Industrial orchestrated the purchase of used Module Express pickers and, through the "settlement" process discussed above, took an ownership interest in the used Module Express pickers. Indeed, CNH Industrial exercised this interest by participating in the resale transaction in a similar fashion as for new Module Express pickers, such that it controlled how much they sold for and how much money each party—itself included—received. In effect, CNH Industrial and the dealer worked collectively to purchase and resell used pickers, and, while each had a different role, CNH itself participated in these transactions, had an ownership interest in the used pickers, and benefited financially from the sale of the used pickers.

49. However, often it was not possible to resell a faulty picker in the same location where it was purchased (as, again, the local community could not be sufficiently deceived as to the viability of that specific piece of equipment). In such circumstances, CNH Industrial would find another dealer through which it could sell the used picker, transfer them to a different geographical dealer market, and again sell them to unsuspecting farmers. The "purchasing" dealer would ultimately not pay anything for the used picker and CNH Industrial would recover the purchase costs through the transaction to the new buyer. CNH Industrial thus took ownership of these Module Express pickers to have dealers sell them to farmers, again, at terms CNH Industrial would dictate.[8] Thus, CNH Industrial was a party to these sales of used Module Express pickers.

50. Upon information and belief, the used Module Express picker purchased by Plaintiff was subject to these practices and was a previous "trade-in" from another farm and thus

---

[8] CNH Industrial's exact machinations in these transactions is obviously not public information. Plaintiffs make these allegations upon information and belief following investigation.

CNH Industrial had involvement in and an ownership role in the transaction.

**CNH Industrial Cannot Waive The Remedies Afforded Under Implied Warranty**

51.     CNH Industrial was a party to each and every sale of a Module Express and the implied warranty of merchantability attaches.

52.     Any attempt by CNH Industrial to limit or waive the implied warranty of merchantability is ineffective for two reasons.  First, any express warranty that may be valid fails in its essentially purpose.  CNH Industrial, given ample opportunity, repeatedly failed to adequately repair Module Express picker, which did not subsequently operate as equipment free of defects should operate.  Plaintiffs suffered innumerable and continuing breakdowns and performance issues with their Module Express picker. Any express warranty remedies do not provide a fair quantum of remedy, as CNH Industrial could not, and would not, adequately repair or replace the failing Module Express picker, effectively depriving purchasers (including Plaintiffs) of the benefit of the bargain. Therefore, any purported limitations of remedies or waiver of implied warranties in any express warranty are invalid.

53.     Second, CNH Industrial cannot limit or waive the warranty of merchantability as any such attempts were made after contracting. *Taterka v. Ford Motor Co.*, 86 Wis. 2d 140, 149 (1978). When farmers purchase the Module Express picker from CNH Industrial at a dealer, they agree to do so through initial documents or agreements which do not contain waivers and limitations. To the extent a warranty that purports to limit or waive remedies or warranties is subsequently provided, it is after such agreement is already made, and therefore is without legal effect.

**Equitable Estoppel, Tolling, and Accrual of The Applicable Statutes of Limitation**

54.     Plaintiffs, despite all due diligence, could not obtain vital information relevant to

the existence of the claims brought in this lawsuit. A reasonable person would not know that the diminished value and faults in the Module Express could possibly due to CNH Industrial's wrongful and intentionally wrongful conduct. Plaintiffs could not have discovered, through the use of reasonable diligence, that CNH Industrial's conduct was unlawful and actionable within the time period of any applicable statutes of limitation. Nor could they have determined with the exercise of any reasonable diligence that the value of the Module Express would decrease precipitously, or that CNH Industrial would intentionally manipulate the resale value of the Module Express pickers.

55. Throughout the relevant time period, CNH Industrial actively concealed the wrongful conduct at issue in this case, failed to disclose from Plaintiffs material information concerning the defective design and manufacture of the Module Express pickers, and CNH Industrial's actions with regard to suppress the resale value of the Module Express pickers. CNH Industrial made false statements, many of which are described above, designed to prevent Plaintiffs from filing suit during the applicable statute of limitations, including that the problems associated with the new and used Module Express pickers could be fixed and were fixed by changes to design. Upon information and belief, CNH Industrial acted knowingly and intentionally to ensure that Plaintiffs could not discover the nature and extent of the conduct giving rise to the claims brought herein, and that Plaintiffs were prevented from suing within the statute of limitations. As a result, Plaintiffs could not have discovered their claims, the issues with the Module Express pickers, or the conduct of CNH Industrial at issue in this litigation through the use of reasonable efforts or reasonable diligence.

## FIRST CLAIM FOR RELIEF
### Violation of the Wisconsin Deceptive Trade Practices Act

56. All allegations and paragraphs in this Complaint are incorporated by reference into

this claim.

57.     CNH Industrial is a "person, firm, corporation or association" as defined by Wisconsin Statutes § 100.18(1).

58.     Plaintiffs are members of "the public" as defined by Wisconsin Statutes § 100.18(1).

59.     With the intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by CNH Industrial to members of the public, CNH Industrial made, published, circulated, and placed before the public-or caused (directly or indirectly) to be made, published, circulated, placed before the public-advertisements, announcements, statements, and representations which contained assertions, representations, or statements of fact which are untrue, deceptive, and misleading.

60.     Such representations include specifically that Module Express picker allowed for one person to operate the Module Express to successfully perform cotton picking and baling functions; that the Module Express had the ability to pack and deposit consistent, domed modules; and that the Module Express had the ability to perform as well on wet ground as it does on dry ground. These representations are not expressions of opinion, they are specific factual statements.

61.     These representations also include that any problems with the Module Express picker was fixable and that they could operate in line with CNH Industrials representations; and that design changes and improvements in the Module Express 635 allowed it to live up to CNH Industrial's representations.

62.     These representations were false, deceptive, and misleading the inherent design and manufacturing defects in all Module Express pickers that were known to CNH Industrial at the time it made those representations could not accomplish these tasks. CNH Industrial made these

representations in relation to the sale of both new and used Module Express pickers. CNH Industrial acted knowingly and intentionally with the purpose of causing and inducing Plaintiffs to purchase or lease Module Express pickers which CNH Industrial knew to be faulty, defective, and which would not operate as promised.

63.     CNH Industrial also engaged in such untrue, deceptive, and misleading conduct as part of a plan or scheme the purpose or effect of which was not to sell merchandise as advertised and induce an obligation; in this case in the form of purchasing or leasing a Module Express machine.

64.     As set out above CNH Industrial makes these representations consistently in marketing materials, in in-person promotional statements (both directly uttered by CNH Industrial agents and dealers who are parroting CNH Industrial's promotional statements), advertisements, and in newspaper articles.

65.     As set out above, the representations and scheme CNH Industrial enacted through them emanated from Wisconsin. CNH Industrial controls all marketing, manufacturing, and selling of the Module Express pickers from its corporate headquarters in Racine, Wisconsin.  The representations at issue here were "made" in Wisconsin in that CNH Industrial "caused them to exist" from Wisconsin, and they were part of a nation-wide scheme whereby they were disseminated from Wisconsin across the country.

66.     As set out above, Plaintiffs themselves were specifically and repeatedly exposed to and materially induced by these consistent marketing statements that Module Express pickers allow for one person to operate the Module Express to successfully perform cotton picking and baling functions; that the Module Express has the ability to pack and deposit consistent, domed modules; and that the Module Express has the ability to perform as well on wet ground as it does

on dry ground. Plaintiffs encountered these representations through advertisements in magazines and periodicals and through in-person communication (with dealers parroting CNH Industrial's statements). These representations were made before the parties entered into a contractual relationship to purchase the respective Module Express picker which is the source of pecuniary loss for Plaintiffs.

67.     The representations caused a pecuniary loss to Plaintiffs in that they incurred damages as a direct result thereof.  Through its conduct, CNH Industrial intended to—and in fact did—materially induce Plaintiffs to purchase Module Express picker which directly and proximately resulted in pecuniary losses, including not receiving the benefit of the bargain in purchasing the Module Express picker, incurring transactional costs, purchasing equipment which lost value precipitously and was not re-sellable, losing time and money through inoperable equipment, and incurring monetary costs associated with faulty equipment during harvest.

68.     Plaintiffs seek to recover their damages, including diminution of value, cost of repair or replacement, refund of full purchase price, attorney's fees under Wisconsin Statutes § 100.18(11), costs, injunctive relief, and punitive damages.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Warranty of Merchantability

69.     All allegations and paragraphs in this Complaint are incorporated by reference into this claim.

70.     CNH Industrial sold goods, specifically the Module Express picker, to Plaintiff. CNH Industrial is in the business of manufacturing and selling such goods and does so regularly.

71.     These goods were not merchantable at the time of sale. They were not fit for the ordinary purpose for which such goods are used, specifically for harvesting cotton and forming it into modules.  Nor were they of average quality, as set out above.

72.     CNH Industrial has actual knowledge of the particular defects at issue in this case through internal communications and reports (tracking complaints from dealers detailing flaws in the Module Express pickers), direct complaints from customers and the public, and internal testing. CNH Industrial, at the corporate executive level, from its Racine, Wisconsin headquarters, is in constant contact with its highly-controlled dealers, both in the United States, and in other parts of the world in which cotton is produced and CNH Industrial sells pickers (South America, for example). CNH Industrial monitors cotton harvests and the operation of its pickers in such harvests and was continually aware of the defects in the Module Express pickers. CNH Industrial received notice of the defects through complaints received by, and repairs conducted by, their controlled dealers, who were aware of the defects in the Module Express pickers and reported such defects to CNH Industrial. Additionally, CNH Industrial has received actual notice through other lawsuits which address such defects.

73.     Plaintiffs have been damaged by CNH Industrial's breach of the implied warranty of merchantability through purchasing and owning a Module Express picker that did not operate as represented, was not fit for the purpose it was sold, including through diminution of value of the Module Express picker, costs of repair and replacement, lost crops, increased crop processing costs, loss of use of the Module Express picker, additional labor costs incurred, and other damages.

74.     As set out above, any attempt by CNH Industrial to limit the implied warranty of merchantability was ineffective because they were given—if at all—after purchase of the Module Express picker and because any limitations failed their essential purpose.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment

75.     All allegations and paragraphs in this Complaint are incorporated by reference into this claim.

76.     To the extent necessary, this count is pled in the alternative to the other counts.

77.     CNH Industrial received money from Plaintiffs which in justice and equity it should not be permitted to keep. The benefit conferred by Plaintiffs was non-gratuitous, CNH Industrial realized value from this benefit, and CNH Industrial has knowledge of that benefit.  It would be inequitable for CNH Industrial to retain this benefit without payment of the value to Plaintiff.

## **PRAYER FOR RELIEF**

Plaintiffs seek:

(1)     all damages not recoverable or recovered through class adjudication, including but not limited to direct and indirect pecuniary loss, consequential damages, and a refund of purchase prices;

(2)     reasonable attorney's fees and costs;

(3)     injunctive relief;

(4)     full restitution of all amounts paid to Defendant;

(5)     punitive damages, and

(6)     all other relief which the Court or jury should find appropriate.


**Plaintiffs demand a trial of all claims by struck jury.**


Dated: May 22, 2020                         Respectfully submitted,



                                            /s/ John Rainwater
                                            John Rainwater
                                            Robert L. Beard
                                            **RAINWATER, HOLT & SEXTON, P.A.**
                                            P.O. Box 17250

Little Rock, AR  72222
(501) 868-2500
 (501) 868-2508 (fax)

s/ John D. Blythin
Shpetim Ademi (SBN 1026973)
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
sademi@ademilaw.com
jblythin@ademilaw.com
meldridge@ademilaw.com